**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TANISHA E.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,<br>*Commissioner of Social Security*,[2]<br><br>Defendant. | Case No. 24-cv-3228-MJS |

## MEMORANDUM OPINION

Plaintiff Tanisha E. ("Ms. E") applied for benefits from the Social Security Administration ("SSA") without success. She brings this case seeking to reverse that ineligibility determination. Ms. E argues that the Administrative Law Judge ("ALJ") erroneously addressed her residual functional capacity ("RFC") by failing to: (1) sufficiently engage with certain aspects of one psychological consultant's opinion; (2) fully account for Ms. E's limitations in concentration, persistence, and pace; and (3) articulate a proper narrative discussion of her physical impairments and limitations. On review, the Court finds the ALJ's determination is supported by substantial evidence and sufficiently explained, and none of Ms. E's arguments provides a basis to upset the ALJ's determination. The Court therefore **DENIES** Ms. E's motion for reversal or remand (ECF No. 5) and **GRANTS** the Commissioner's cross-motion for affirmance (ECF No. 11).

---

[1] Per recommended practice, the Court partially redacts Plaintiff's name. *See* Privacy Concern Regarding Social Security and Immigration Opinions (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf (advising use of "only the first name and last initial" in Social Security cases).

[2] The current Commissioner is automatically substituted as the named defendant. Fed. R. Civ. P. 25(d).

## RELEVANT BACKGROUND

In May 2023, Ms. E applied for disability insurance and supplemental social security benefits with the SSA, alleging disability due to scoliosis, shoulder-related ailments, and various mental impairments, including bipolar disorder, depression, and memory loss. (ECF No. 4, Administrative Record ("AR") at 223.)[3] After the agency denied Ms. E's claims initially and on reconsideration, she requested a hearing before an ALJ. (*Id.* at 109–17, 121–27, 130–31.) Following that hearing—during which the ALJ considered testimony from Ms. E and a vocational expert, alongside documentary evidence (*id.* at 35–69)—the ALJ determined that Ms. E was not disabled within the meaning of the Act (*id.* at 18). Even though the ALJ found that Ms. E exhibited certain severe mental and physical impairments—*i.e.*, shoulder dislocation, scoliosis, generalized anxiety disorder, bipolar disorder, and substance abuse disorder—the ALJ ultimately concluded that her RFC allowed for a range of light-duty work with certain limitations. (*See id.* at 17–30.)

Relevant here, the ALJ evaluated several medical opinions, including one from a state-agency psychological consultant, Dr. Aroon Suansilppongse. In broad strokes, Dr. Suansilppongse opined that: (1) Ms. E could "understand and remember simple instructions"; (2) Ms. E could "carry out simple instructions," such that even though her mental impairments "would occasionally interfere with her ability for sustained concentration, persistence or for task completion," she "would be able to complete tasks at an acceptable pace"; (3) Ms. E's "social avoidance and infrequent episodes of panic attacks … would occasionally interfere with her ability to interact appropriately with supervisors, coworker or the public," but "she would be able to complete tasks with infrequent contact with others"; and (4) Ms. E "has mental capacity for simple work related

[3] Page citations to the AR refer to the Bates number at the lower right margin. Page citations to the parties' briefing, by contrast, refer to the ones assigned by the Court's electronic filing system.

activity (1-2 step tasks) with minimal limitation due to alleged pain." (AR at 92.) The ALJ deemed Dr. Suansilppongse's opinion only "somewhat persuasive." (*Id.* at 27.) To that end, the work-related limitations that the ALJ identified for Ms. E were mostly consistent with Dr. Suansilppongse's views, but not entirely: Ms. E was restricted to "simple, nonproduction paced tasks that involve simple work-related decisions and few changes in a routine work setting" and "limited to frequent interaction with supervisors and coworkers, occasional tandem work, and occasional public interaction." (*Id.* at 26; *id.* at 27.) The ALJ did not mention any potential limitation to "1-2 step tasks" for Ms. E, even if only to explain why they were not adopting it.

After establishing Ms. E's RFC—which also included certain physical limitations the ALJ believed were necessary—the ALJ relied on a vocational expert's testimony to conclude that Ms. E was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR at 30.) So, the ALJ found Ms. E "not disabled" under the Act. (*Id.*)

After the Appeals Council denied Ms. E's request for further relief, she timely initiated judicial review with this Court under 42 U.S.C. § 405(g). She now moves for a judgment of reversal, arguing that the ALJ improperly addressed her RFC in several specific ways. (*See* ECF No. 5 ("Mot.").) In response, the Commissioner cross-moves for a judgment of affirmance. (ECF No. 11 ("Opp'n").) The parties' dueling motions are fully briefed and ripe for decision.

## LEGAL STANDARDS

In Social Security cases, "[t]he Commissioner's 'ultimate determination' about entitlement to benefits 'will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards.'" *Cox v. Kijakazi*, 77 F.4th 983, 990 (D.C. Cir. 2023) (quoting *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004)). Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (citations and quotation marks omitted); *see also Butler*, 353 F.3d at 999 (describing substantial evidence as "more than a scintilla, but … less than a preponderance"). Courts must "carefully scrutinize" the record for substantial evidence but may not reweigh the evidence directly, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (citation and quotation marks omitted), as judicial review in this context is "highly deferential to the agency fact-finder," *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). Importantly, though, the ALJ must build an "accurate and logical bridge" from the evidence to their conclusions that allow for meaningful review. *Lane–Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). Finally, even if a court discerns error in the ALJ's analysis, it must "affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021)*; Wilson v. Comm'r of Soc. Sec.*, 2025 WL 2047967, at *3 (D.C. Cir. July 22, 2025) (explaining that only an "error that affected the outcome of the proceeding will support reversal").

**DISCUSSION**

In pressing for reversal, Ms. E challenges the ALJ's assessment of her RFC.[4] She argues, more specifically, that the ALJ: (1) improperly engaged with Dr. Suansilppongse's opinion, including the suggested restrictions to "simple work" involving no more than "1-2 step tasks" and

[4] Benefit claims under the Act are assessed through a five-step analysis whereby an ALJ evaluates whether the claimant: (1) worked during the alleged period of disability; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) could return to past relevant work; and (5) if not, could perform any other work in the national economy. *See Butler*, 353 F.3d at 997 (describing each step); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (articulating five-step analysis for disability insurance benefits and supplemental social security, respectively). Ms. E's arguments for reversal in this case implicate steps four and five because they focus on the ALJ's assessment of her residual functional capacity—or "RFC," in Social Security parlance—a determination that aims to capture the most "an individual can do despite [their] limitations." *See* Social Security Ruling 96–8p, 1996 WL 374184, at *1 (July 2, 1996); *see also Butler*, 353 F.3d at 1000 (explaining that an "RFC assessment bears on [a claimant's] ability to perform past relevant work (step four) and her ability to do 'other work' (step five)").

"infrequent contact with others" (Mot. at 6–11); (2) did not properly account for Ms. E's moderate limitation in concentration, persistence, or pace (*id.* at 11–20); and (3) did not include a sufficient narrative discussion of Ms. E's physical impairments and the resulting limitations (*id.* at 20–23). The Court addresses each argument in turn.

## I. The Psychological Consultant's Opinion

Start with Ms. E's arguments about the ALJ's treatment of Dr. Suansilppongse's opinion. She claims error in two ways. First, even though the ALJ adopted a limitation consistent with Dr. Suansilppongse's overall belief that Ms. E should be restricted to "simple tasks," Ms. E still complains that the ALJ wrongly failed to include or mention a more specific restriction to "1-2 step tasks." Second, Ms. E argues the ALJ improperly ignored Dr. Suansilppongse's assessment that Ms. E should be limited to "infrequent" contact with others. Neither angle persuades.

At the outset, recall that the ALJ found Dr. Suansilppongse's opinion to be only "somewhat persuasive." (AR at 27.) That finding differentiates this case from all of Ms. E's cited cases (*see* Mot. at 7–8) because those courts wrestled with the incongruence of the ALJs placing "great weight," "considerable weight," or "significant weight" on an opinion but then failing to adopt a component of the opinion that limited the claimant to 1-2 step instructions, without explaining the deviation. *See Yvette J. v. Saul*, 2019 WL 3720294, at *3 (D. Md. Aug. 6, 2019) (finding error where the ALJ accorded "great weight" to two experts who opined that the claimant "had a limitation of performing simple one-to-two step instructions as opposed to one-to-four-step instructions," but then assessed the claimant's RFC as allowing for "one-to-four step tasks," without explanation); *Laura K. v. Kijakazi*, 2021 WL 4391123 (D. Md. Sept. 24, 2021) (similar); *Jennifer S. v. Berryhill*, 2018 WL 5112407, at *3–4 (D. Md. Oct. 19, 2018) (similar). If the ALJ here had deemed Dr. Suansilppongse's opinion "persuasive" or "very persuasive"—or endorsed

the opinion as carrying "great weight" or "significant weight"—then Ms. E's argument about the ALJ's apparent disregard for the proffered limitation to "1-2 step tasks," at least without some articulated explanation, would ring more resonantly. But as the Commissioner rightly states, an "ALJ is not categorically required to 'specifically reject every limitation contained in a report that the ALJ has discussed and found to be only *partially or somewhat persuasive*.'" (Opp'n at 20–21 (quoting *Owens v. Kijakazi*, 2023 WL 2344224, at *3 (4th Cir. Mar. 3, 2023) (emphasis added).)

Other courts have recognized and applied this principle in the same context implicated here—where an ALJ deemed a medical opinion only "partially persuasive" and then proceeded not to adopt the opinion's recommended limitation to "1-2 step tasks." *See, e.g.*, *Swain v. Bisignano*, 2026 WL 2906819, at *2 (E.D. Tex. Sept. 28, 2026) (explaining that an ALJ was not required "to separately explain his treatment of each phrase contained within [a psychological consultant's] findings or to adopt every functional limitation stated by a source whose findings he considered partially persuasive"); *Cardenas v. Comm'r of Soc. Sec. Admin.*, 2026 WL 2444514, at *8 (N.D. Ohio Aug. 20, 2026) (finding no error where ALJ did not adopt a "1-2 step task" limitation from a consultant's opinion that the ALJ found "only partially persuasive"); *Carrie B. v. Kijakazi*, 2022 WL 1228194, at *3 (N.D. Ill. Apr. 26, 2022) (similar). This makes sense, especially considering that "[t]he ultimate determination of RFC is specifically reserved to an ALJ[.]" *Dowell v. Colvin*, 232 F. Supp. 3d 1, 7 (D.D.C. 2017). "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt" the opinion's various "limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Richmond v. Bisignano*, 2025 WL 2652140, at *6 (S.D. Ga. Sept. 16, 2025) ("The ALJ is under no obligation to adopt verbatim all of the doctor's limitations into the RFC.") (cleaned up).

In keeping with these principles, the ALJ's non-adoption of Dr. Suansilppongse's limitation to "1-2 step tasks" was not obviously improper. And neither was the ALJ's omission of a more explicit or fulsome discussion of that facet of Dr. Suansilppongse's opinion. The ALJ adequately described their rationale for fixing an RFC that restricted Ms. E to "simple tasks" with other accompanying limitations. As the ALJ explained:

> The limitation to simple tasks is consistent with the claimant's display of impaired attention, concentration, and memory during her consultative psychological examination secondary to emotional distress. Such findings, coupled with the potential effects of substance abuse, also support further restriction to nonproduction paced tasks, simple work-related decisions, and few changes in a routine work setting to minimize stress.

(AR at 27; *see also id.* at 26 ("[T]he claimant's alleged mental symptoms and limited objective findings support restricting her to performing simple, nonproduction paced tasks that involve simple work-related decisions and few changes in a routine work setting to minimize stress and avoid exacerbating her mental symptoms."). As the Commissioner reasonably reads the ALJ's rationale, the RFC "included additional provisions to limit the potential *stress level* – rather than the *complexity* – of the tasks [Ms. E] could perform." (Opp'n at 21 (emphases added) (citing AR at 16–17, 26).) Thus, the Court can fairly discern the ALJ's reasoning even absent a more clearcut explanation for deviating from the recommended limitation to "1-2 step tasks."[5]

Turning to whether the ALJ erroneously deviated from Dr. Suansilppongse's assessment that Ms. E should be limited to "infrequent" contact with others, that theory fails for many of the same reasons. Again, the ALJ found Dr. Suansilppongse's opinion only "somewhat persuasive"

---

[5] That said, this issue would have been considerably more straightforward to resolve if the ALJ had included even a sentence or two that more concretely articulated the rationale for not adopting a "1-2 step tasks" limitation. As an example, a different ALJ in a different case addressed the point as follows: "[W]hen I limit [Plaintiff] to simple, routine tasks, I am not adopting a further restriction to 1-2 step task/instructions. Simple, routine tasks are consistent with unskilled work and may involve more than 1-2 step tasks/instructions and still be simple and routine." *Richmond*, 2025 WL 2652140, at *4.

generally, so it makes sense that the ALJ would incorporate certain of the proposed limitations on Ms. E's ability to interact with others, but perhaps not as fully as suggested. And ultimately, the ALJ did limit Ms. E to only occasional interaction with the public and placed additional limitations on the nature of her interaction with coworkers (only "occasional tandem work") to account for Ms. E's symptoms of "anxiety and nervousness." (AR at 27.) But the ALJ otherwise concluded that Ms. E could tolerate "frequent" interaction with supervisors and coworkers because the record did not support greater limitations along those lines, including because Ms. E was able to maintain "intact alertness and cooperative behavior during examinations, despite her emotional distress." (*Id.*) Although Ms. E may disagree with that assessment, the ALJ built a logical bridge to explain this aspect of their RFC determination, and substantial evidence supports it.

In sum, the Court sees no basis to conclude that the ALJ improperly disregarded or failed to engage with Dr. Suansilppongse's opinion regarding Ms. E's potential limitations.

## II. The Moderate CPP Limitation

Next, Ms. E challenges the ALJ's treatment of her "moderate" limitation in concentration, consistency, and pace—commonly shorthanded in the Social Security context as "CPP." (*See* Mot. at 11–20; AR at 21 ("With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.").) The Court finds this argument similarly unpersuasive.

CPP limitations affect a claimant's "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (citation omitted). Where, as here, an ALJ identifies a "moderate" CPP limitation, they must adequately address it in the RFC. *See*, *e.g.*, *Mirlin T. v. Kijakazi*, 2021 WL 9217635, at *10 (D.D.C. Aug. 24, 2021). And as Ms. E appropriately points out, there are plenty of cases in this District holding that an ALJ's mere

restriction to "simple, routine, and repetitive tasks is insufficient" to address that limitation. *See id.* (quoting *Petty*, 204 F. Supp. 3d at 206); *William R. v. King*, 2025 WL 399974, at * (D.D.C. Feb. 5, 2025) ("[A]n ALJ's limitation to 'simple, routine tasks'—or similar variations—is insufficient, standing alone, to address a claimant's moderate CPP limitation."). As those cases explain, "such a restriction, without more, does not actually address [a claimant's] mental impairments because the *difficulty* of a task does not necessarily say anything about his *ability to concentrate* on it." *Shea M. v. Kijakazi*, 2023 WL 3040602, at *18 (D.D.C. Apr. 21, 2023); *Petty*, 204 F. Supp. 3d at 206 (similar). But an ALJ can properly account for a moderate CPP limitation by either: (1) "including additional limitations in the RFC relevant to the CPP domain beyond an unadorned simple, routine, and repetitive tasks … restriction"; or (2) "adequately explaining why, notwithstanding the moderate CPP limitation, the plaintiff's overall limitations do not affect his or her capacity to sustain simple, routine, or unskilled work." *Teresa D. v. Bisignano*, 2025 WL 2255216, at *9 (D.D.C. Aug. 7, 2025) (quoting *Shea M.*, 2023 WL 3040602, at *18).

The ALJ sufficiently addressed the CPP limitation through something of a hybrid approach to this framework. For one thing, the ALJ imposed additional restrictions as part of the RFC beyond a barebones constraint to "simple, routine work," including by eliminating any production-pace requirement and by minimizing complex work-related decisions and potential changes to the work setting. (AR at 26–27.) These additional restrictions might not suffice in and of themselves, as other courts have concluded. *See, e.g.*, *Johnson v. Saul*, 2021 WL 411202, at *6 (D.D.C. Feb. 5, 2021) ("[N]ot having to meet production goals or quotas does not explain how long plaintiff can stay on task[.]"); *Louis L. v. Bisignano*, 2026 WL 1453729, at *8 (D.D.C. May 22, 2026) (similar); *Shea M.*, 2023 WL 3040602, at *18 (finding that additional limitation to gradual "changes in work

duties," without something more, did not suffice); *Angela P. v. Bisignano*, 2025 WL 3706652, at *17 (D.D.C. Dec. 22, 2025) (similar). But the ALJ here went farther.

Picking up on the second path described above, the ALJ articulated a sufficient explanation for deeming the combined restrictions sufficient to address a moderate CPP limitation. The combination of restrictions—*i.e.*, "simple, nonproduction paced tasks that involve simple work-related decisions and few changes in a routine work setting"—was expected to "minimize stress and avoid exacerbating her mental symptoms." (AR at 26, 27.) And more still, the ALJ imposed additional limitations on Ms. E's interactions with others to further "account for her anxiety." (*See id.*) As the ALJ's decision reflects, assuming those limitations lowered Ms. E's anxiety and stress, the ALJ believed they would reasonably address any CPP-related limitation, too. (*Id.* at 26 (accepting that Ms. E's "impaired attention, concentration, and memory" during consultative examination was "most likely due to anxiety, emotional distress, and nervousness").).

The ALJ's explanation did not stop there. The ALJ pointed out that Ms. E herself reported being able to follow instructions (AR at 21; *see also* AR at 240 (Ms. E's Function Report attesting that she follows both written and spoken instructions "very well")), which tends to "indicate[] that she can concentrate—that is, stay on task—for at least some period of time," *Laura A. v. Kijakazi*, 2022 WL 3644810, at *12 (D.D.C. Aug. 24, 2022). And the ALJ additionally highlighted that Ms. E reported an ability to engage in a range of activities that require at least some degree of sustained focused attention, including driving, counting change, grocery shopping, reading books, and managing her own finances and medical care. (AR at 21.) This was the sort of explanation missing in *Angela P. See* 2025 WL 3706652, at *17 ("[T]he ALJ might have pointed to facets of Plaintiff's life where she exhibits sustained focused attention …. But the ALJ did not do so."). But as the Commissioner indicates (Opp'n at 16–17), the ALJ's decision here addressed those points.

Because the ALJ crafted several restrictions to address Ms. E's moderate CPP limitation and reasonably explained why they were likely to suffice, Ms. E's second argument fails.

### III. The ALJ's Narrative Discussion

Finally, Ms. E faults the ALJ for omitting an appropriate "narrative discussion setting forth how the evidence supported *each* conclusion." (Mot. at 20.) This time around, the argument focuses on Ms. E's physical impairments and the resulting physical limitations the ALJ identified in fixing her RFC (*see id.* at 20–23; ECF No. 15, Reply at 4–5)—in contrast to Ms. E's first two theories, which concentrated on her mental impairments and those related limitations. Here, too, the Court concludes that the ALJ sufficiently explained those aspects of the RFC that focused on physical limitations and finds that the ALJ's findings are supported by substantial evidence.

In evaluating a claimant's RFC, an ALJ must include a "narrative discussion" describing how the evidence "supports each conclusion" concerning the claimant's "function-by-function" capabilities. *Butler*, 353 F.3d at 1000 (quoting Social Security Ruling96–8p, 1996 WL 374184, at *3, *7). Put another way, "the ALJ must explain the basis of the restrictions he lists in the RFC determination with citations to specific medical facts and nonmedical evidence." *Mitchell v. Berryhill*, 241 F. Supp. 3d 161, 168 (D.D.C. 2017) (cleaned up). It is not enough to "simply pronounce the claimant's RFC after summarizing the record evidence." *Id.*; *see also Lane-Rauth*, 437 F. Supp. 2d at 68 (emphasizing that the law required more than "a laundry list and a conclusion"). The ALJ must "build an accurate and logical bridge from the evidence to [their] conclusion[s]." *Mitchell*, 241 F. Supp. 3d at 168 (quoting *Williams v. Colvin*, 134 F. Supp. 3d 358, 364 (D.D.C. 2015)).

Ms. E asserts that the ALJ ran afoul of these principles. She argues, generally, that the ALJ used an improper, laundry-list-like approach to the analysis. And she argues, more specifically,

that the ALJ: (1) never explained the basis for finding that she required to move from a seated position to standing—or vice versa—on a regular basis, and (2) "failed to evaluate in any manner [her] abilities to sit, stand, walk, or lift" during a workday. (Mot. at 20.) Both arguments fail.

On the first point, the ALJ did not simply summarize the evidence and then proclaim an RFC unmoored from any explanatory analysis. To the contrary, the ALJ showed their work. In fixing Ms. E's physical limitations, the ALJ relied mostly on the assessments of the consultative examiners and the state agency physician, as well as Ms. E's own testimony, weaving the rationale for the limitations they adopted into the discussion of the relevant evidence. In walking through Ms. E's own statements regarding her impairments and abilities, for instance, the ALJ explained that her "history of scoliosis, right shoulder dislocation, and residual pain" supported a limitation to "light exertional work" with an ability to "alternate positions throughout the workday" and other lifting and reaching restrictions. (AR at 25.) Elsewhere, in discussing the opinions of the medical consultants, the ALJ deviated from a recommendation that Ms. E could perform "medium" exertional work, explaining that a more restrictive limitation to "light" exertional work was "more consistent with the residual deficits stemming from the claimant's history of scoliosis and right shoulder dislocation." (*Id.* at 27.) And the ALJ reasoned that Ms. E's "spinal pain stemming from scoliosis supports adding a sit/stand option," especially since Ms. E stated that "position changes offer pain relief." (*Id.*) The ALJ's engagement with these points (and others) fulfilled the obligation to set forth an appropriate narrative discussion "that allows the undersigned to conduct a meaningful review." *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017).

Ms. E's more specific arguments fare no better. As the above discussion reflects, the ALJ did, in fact, provide a rationale for imposing a sit/stand limitation: Ms. E's residual "spinal pain stemming from scoliosis" and her observation that "position changes offer pain relief." (AR at 27.)

And the ALJ did, in fact, address Ms. E's ability to sit (*see id.* at 22, 23, 24, 27), stand (*see id.* at 22, 23, 24), walk (*see id.* at 24), and lift (*see id.* at 25). In summarizing the consultative examination, the ALJ described how Ms. E "exhibited normal gait and stance[,]" maintained "the ability to squat two-thirds, rise from a chair … and walk on her heels and toes without difficulty[,]" and "did not require help changing for the examination or getting on and off the examination table." (*Id.* at 24.) The ALJ likewise noted that at a different evaluation, Ms. E "exhibited full active range of motion in her bilateral shoulders and elbows." (*Id.* at 24–25). Then, weighing that evidence against Ms. E's "history of scoliosis, right shoulder dislocation, and residual pain," the ALJ adopted several limitations that restricted Ms. E's ability to work, including "light exertional work," limited "postural maneuvers to avoid movements that could stress her right upper extremity and back," and more. (*Id.* at 25.)

These points alone are enough to reject Ms. E's final argument. But the Court flags another: Ms. E never articulates any work-related limitation(s) she contends the ALJ should have included in the RFC but did not. Instead, her argument is purely procedural—form over substance. Without Ms. E pointing to any purportedly needed-but-overlooked limits on her ability to work, or any conflicting evidence that she believes the ALJ failed to address, the Court could only conclude that any possible flaws in the ALJ's narrative discussion are harmless. *Mitchell*, 241 F. Supp. at 174 (citing *Schutlz v. Comm'r of Soc. Sec.*, 2016 WL 1253044, at *5 (W.D. Mich. Mar. 31, 2016)). This is especially true considering that when the ALJ deviated from the medical consultants, the ALJ generally did so in Ms. E's favor—*e.g.*, restricting her to "light" exertional work rather than "medium" exertional work. To the extent any potential narrative shortcomings resulted in greater RFC limitations on her ability to work, they "worked in [her] favor" and were "harmless." *Id.*

## CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's decision was sufficiently supported and sufficiently explained. The Court therefore **DENIES** Ms. E's motion for reversal, (ECF No. 5) and **GRANTS** the Commissioner's motion for judgment of affirmance, (ECF No. 11). The Court will issue a separate order so stating.

Dated: November 25, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge